NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0117-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ANTHONY L. GIBSON, a/k/a
ANTHONY GIBSON,

    Defendant-Appellant.

_____

Argued December 1, 2025 – Decided December 19, 2025

Before Judges Sabatino, Natali and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment Nos. 19-06-1759, 19-07-1907 and 22-01-0099.

Rachel Glanz, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Rachel Glanz, of counsel and on the briefs).

Matthew E. Hanley, Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Essex County Prosecutor, attorney; Matthew E. Hanley, of counsel and on the briefs).

Peter Quinn argued the cause for amicus curiae The Association of Criminal Defense Lawyers of New

Jersey (Lowenstein Sandler LLP, attorneys; Scott B. McBride and Peter Quinn, on the brief).

Brian Uzdavinis, Deputy Attorney General, argued the cause for amicus curiae Attorney General (Matthew J. Platkin, Attorney General, attorney; Brian Uzdavinis, of counsel and on the brief).

Appellant filed a supplemental brief on appellant's behalf.

The opinion of the court was delivered by

SABATINO, P.J.A.D.

After a jury trial, defendant Anthony Gibson, a police officer, was found guilty of theft by unlawful taking and official misconduct. The trial court imposed five-year concurrent sentences on these offenses, as well as concurrent sentences on defendant's guilty plea to other unrelated offenses in separate indictments.

As we will elaborate, defendant, a detective with the Newark Police Department ("NPD"), began taking paid administrative sick leave in March 2018. The NPD policies prohibited officers on sick leave from engaging in any outside employment. However, defendant worked at a second job as a security guard at St. Michael's Hospital on multiple occasions during his period of leave. He had previously been approved to work that second job before taking sick

leave. The State argued that on those days, defendant illegally took his full salary from the NPD, to which he was not entitled under the policies.

Among other things, defendant argues that his motion for acquittal should have been granted as to the official misconduct charge because his violation of internal NPD policies did not amount to an unauthorized exercise of his official functions.

For the reasons set forth in the published portion of this opinion, we reverse and vacate defendant's conviction of official misconduct under N.J.S.A. 2C:30-2(a) on count two because there is inadequate evidence that defendant's receipt of sick pay in violation of the NPD's leave policies constituted "an unauthorized exercise of his official functions" as a police officer. We affirm, however, defendant's conviction of theft in count one. We reject defendant's other arguments in the unpublished portion of this opinion.

We remand the case to the trial court for resentencing and to address other specified matters in light of our disposition.

I.

We summarize the facts and procedural history, with particular focus on the matters most relevant to defendant's conviction of official misconduct.

A.
(NPD's Policies and Procedures)

3

Sick Leave

Pursuant to an internal policy, the NPD provides unlimited, fully paid sick leave for injured or ill employees. The policy requires an officer who calls out sick to stay at home; the NPD must call the officer at least once during the officer's scheduled shift to ensure compliance with this mandate. If the officer does not answer the call, a supervisor is sent to the home for a well-being and compliance check.

An NPD officer may be placed on administrative sick leave when it is expected that the officer will be absent from work for more than five days. Relevant here, officers are considered "injured" when they "incur an on-duty physical infliction which renders [them] unable to capably perform their assigned duties." Officers are "sick" when they are "affected by a physical or mental disorder" which similarly makes it impossible to "capably perform their duties." The officer must provide medical documentation supporting the need for administrative sick leave. Officers on administrative sick leave are not subject to "home confinement status" and are not called or visited while they are out of work.

A-0117-23

Outside Employment

The NPD's outside employment policy permits officers to "supplement their income by engaging in authorized extra duty employment." In 1997, the policy stated that a request to engage in outside employment would be denied if it appeared from "the applicant's sick record or other evidence" that such employment "might impair his ability to discharge his police department obligations." In 1999, the policy was updated to provide that when an officer is "booked off . . . for illness or injury, the permission that is granted for outside part-time employment is automatically rescinded for the duration of the sick leave." Both the former and the updated versions of the policy stated that personnel on sick leave who engage in outside employment "may be committing a criminal act." These relevant provisions remained the same through several further updates to the policy before 2018.

Testimony About the NPD Policies

John Rawa, a former captain with the NPD, testified that outside employment was not permitted for officers on administrative sick leave because an officer's "primary job is to be a full duty police officer." He explained that it was the NPD's position that if an officer "cannot perform [the] functions" of the

police work to which the officer was assigned, that an officer also "wouldn't be able to be approved for any outside employment work."

Lieutenant John Neves, the executive officer at the NPD's Internal Affairs ("IA") Division, testified that when new policies are introduced or existing ones are updated, the police director writes a memo advising all officers of the change. Prior to 2018, all new or revised policies were disseminated to officers during roll call before a shift began, and the officers were required to sign a roster sheet to acknowledge receipt of a physical copy. Antonio Dominguez, a retired captain of the IA Division, testified that a supervisor's failure to disseminate a policy update would result in discipline.

The director's memo for the updated 1999 version of the outside employment policy provided that the policy would be "distributed to all personnel with the January 6, 2000, payroll checks and shall be [the] subject of roll call training for a period of two weeks." In 2002, another memo related to an update to that policy stated that the policy's contents would again be the subject of roll call training for two weeks.

Neves testified that the IA Division reviews complaints against employees. If a complaint is clearly not "worthy of a criminal investigation," the Division handles the investigation internally, but if a complaint carries an

6

implication of criminality, it is referred to the Prosecutor's Office. The Prosecutor's Office makes the ultimate determination whether a matter is criminal. According to Neves, the Prosecutor's Office responds to a criminal complaint by either taking over the investigation from the IA Division right away or advising the Division to continue investigating until "certain information" is gathered. The second response is more common.

Neves testified that many officers who violate the NPD's sick leave policy are disciplined administratively, without any referral to the Prosecutor's Office. Dominguez similarly testified that during his time in the IA Division, officers were often disciplined internally for violating the outside employment policy. However, both Neves and Dominguez also said that sometimes criminal charges were filed against officers who did not abide by the policies. They acknowledged on cross-examination that the policies did not explicitly inform officers when a violation would be dealt with as a criminal matter. However, Dominguez said that all officers are expected to be aware of and abide by all NPD policies. He read an internal regulation into the record, which stated that ignorance of a policy was not considered an excuse for a violation.

A-0117-23

## B.
### (Investigation Into Defendant)

Defendant began working for the NPD in 1993 and was promoted to the rank of detective in 1996. In 1997, he was given permission to work a second job as a security guard at St. Michael's. Defendant continued to work at both jobs throughout the rest of his career with the NPD.

In early 2018, defendant was transferred to the Communications Division, which oversees and processes emergency calls. Rawa, who had worked as captain of that unit, testified that officers assigned there perform mostly administrative duties such as answering calls and fulfilling requests for audio recordings. Officers in the Communications Division are not expected to conduct arrests or do other physical police work.

Walter Pagan, who had been the Director of Public Safety, Security, and Emergency Management at St. Michael's from 2006 to 2016 and returned to that position in 2020, testified that when working as a guard at the hospital, defendant was often assigned to the emergency room ("ER"). Pagan explained that the duties of officers in the ER were "high risk" and included deescalating situations with disorderly patients and keeping nursing staff safe. However, Pagan acknowledged that he was not working at St. Michael's in 2018 and did

8

not have knowledge of defendant's specific assignments and duties during that year.

According to Pagan, defendant as a security officer wore a blue "public safety uniform" with a St. Michael's insignia on it. Defendant was armed in that job, although the record does not indicate whether it was his personal firearm. Pagan testified that security officers could not put restraints on combative patients but could hold them down to stop the patients from escaping. If a person was found illegally carrying a weapon, NPD officers would be called in to respond.

On cross-examination, Neves testified that he did not personally know whether defendant was trained on or received copies of the sick leave and outside employment policies. Neves, Rawa, and Dominguez were all unaware of, and the State did not otherwise introduce into evidence, any documents from defendant's file indicating that he had ever signed a roster acknowledging receipt of the policies.

On March 6, 2018, the NPD placed defendant on administrative sick leave. The reason defendant sought sick leave is not fully clear from the record. Defendant testified that he was involved in a car accident at some point prior to March 2018, and that he was thrown down a flight of stairs in the course of his

work as a detective, resulting in a serious back injury. The State, however, presented evidence showing that defendant's leave record did not reference any injuries and that he had requested sick leave because he was suffering from gout. Regardless, NPD records introduced at trial indicated that defendant was on administrative sick leave from March 6 to November 2, 2018, a period of about seven months.

At some point the IA Division received a criminal complaint against defendant. The nature of this complaint was not described at trial and it is unclear if it was referring to the allegations in the current matter. The IA Division followed its usual practice and contacted the Prosecutor's Office, which advised it to cease investigating and turn over all evidence it had gathered at that point.

Captain Carlos Olmo led the investigation into defendant on behalf of the Prosecutor's Office. Olmo testified that as his investigation proceeded, he obtained defendant's sick leave and pay records from the NPD and St. Michael's. Olmo cross-referenced these records and discovered that starting on March 20, 2018, defendant worked a total of thirty-one days at St. Michael's despite being on sick leave from the NPD. Olmo calculated that defendant had earned

$11,217.04 in sick pay for those days. He also learned that defendant had bought a new truck costing approximately $60,000 in the summer of 2018.

## C.
### (Defendant's Trial Testimony)

Defendant testified that he was not informed about the NPD's sick leave and outside employment policies during roll calls while he was a patrol officer from 1993 to 1996. He did not recall ever signing anything to the effect that he had received a physical copy of either.

Defendant claimed that after he became a detective, he was not privy to any announcements about, or training on, policies that occurred during roll calls because he was not required to attend them. He said he "didn't have a clear understanding" of the outside employment policy when he began taking his administrative sick leave in 2018, and that he was never informed of what "circumstances" could lead to him being charged with a crime under that policy.

Defendant conceded that he was not exempt from the policy by virtue of being a detective and understood that all such policies were binding on him. He also did not contest that he worked at St. Michael's while on administrative sick leave from the NPD.

Defendant stated he had ordered an expensive vehicle in 2017, before he began taking sick leave, but that it was only delivered to him in 2018. However,

11

he admitted that a purchase order for the vehicle, which was entered into evidence was dated June 30, 2018.

According to defendant, when he was working in the Communications Division at the NPD, one of his duties was to gather and deliver boxes of audiotapes. He asserted the boxes he needed to lift weighed "forty-five, fifty, maybe up to like maybe seventy pounds," and that this worsened his back injury. Defendant testified his duty belt also weighed up to forty-five pounds, and that wearing it caused him serious pain. He said he "constantly had to stand up and move around" while working in Communications. Defendant did not testify about his duties when working at St. Michael's in 2018.

In his opening statement, defense counsel stated that defendant's job in Communications was "to sit in a room, look at a bank of screens that were bringing in camera feeds, [and] keep an eye on things." Counsel said that "if there was something amiss or something that had to be responded to, [defendant] would call in and . . . the people who are the guards there would check it out and do whatever needed to be done." Counsel commented that there was "no physical labor at all for [defendant] on that job."

## D.
### (This Indictment and Other Charges)

Defendant was charged in Indictment No. 19-06-1759, the indictment primarily at issue here, with theft by unlawful taking of payment for sick time from the NPD under N.J.S.A. 2C:20-3(a) (count one), and official misconduct under N.J.S.A. 2C:30-2(a) (count two). He was separately charged in Indictment No. 19-07-1907 with theft by unlawful taking of a vehicle from a car dealership under N.J.S.A. 2C:20-3(a), passing bad checks under N.J.S.A. 2C:21-5(b), and official misconduct, and in Indictment No. 22-01-99 with conspiracy to distribute a controlled dangerous substance ("CDS") under N.J.S.A. 2C:5-2 and 2C:35-5(a)(1), distribution of CDS under N.J.S.A. 2C:35-5(a)(1) and (b)(1), and official misconduct.[1]

As we will discuss in more detail in Part III(A) of this opinion, on August 24, 2020, a pretrial judge[2] granted private defense counsel's motion to be relieved and directed that defendant be represented by a public defender if he did not hire new private counsel within seven days. With a public defender as

---

[1] The additional counts of official misconduct in these two indictments were based on those other charges, and not based on the sick pay policy violation at issue here.

[2] A different judge ("the trial judge") eventually tried the case.

A-0117-23

his counsel, defendant was tried before a jury on the charges in Indictment No. 19-06-1759 over several days in March 2023.

E.
(Verdict and Sentencing)

After the proofs closed, the trial judge denied defendant's motion for acquittal. The jury found defendant guilty on both counts.

A few weeks after the trial, defendant pled guilty as to the other two indictments, passing bad checks, an amended charge of third-degree conspiracy to distribute CDS, and official misconduct related to the CDS charge. The State agreed to recommend an aggregate sentence on those other charges of five years imprisonment, to run concurrent with the sentence defendant received on the indictment that was tried.

In April 2023, the trial judge sentenced defendant on all three indictments to concurrent sentences of five years imprisonment on each of the five charges for which he was convicted. The remaining charges in Indictment Nos. 19-07-1907 and 22-01-99 were dismissed. Defendant also forfeited his public employment.

14

F.
(Appeal)

This appeal followed. Defendant raises the following arguments in his counseled briefs:

> POINT I
>
> A JUDGMENT OF ACQUITTAL SHOULD HAVE BEEN GRANTED AS TO THE OFFICIAL MISCONDUCT CHARGE BECAUSE DEFENDANT'S VIOLATION OF INTERNAL POLICE DEPARTMENT POLICIES WAS NOT "AN UNAUTHORIZED EXERCISE OF HIS OFFICIAL FUNCTIONS."
>
>> A. The Sick Time And Outside Employment Policies Do Not Establish Duties Imposed "By Law."
>>
>> B. The Duty To Abide By The NPD's Sick Time And Outside Employment Policies Is Not "Clearly Inherent In the Nature" Of A Police Officer's Public Position.
>
> POINT II
>
> DEFENDANT WAS ERRONEOUSLY DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO COUNSEL OF CHOICE.
>
> POINT III
>
> DEFENDANT WAS DENIED THE RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW DUE TO THE ERRONEOUS ADMISSION OF HEARSAY EVIDENCE (Not Raised Below).

15

A-0117-23

POINT IV

THE THEFT CONVICTION MUST BE REVERSED BECAUSE THE COURT FAILED TO INSTRUCT THE JURY ON THE CLAIM OF RIGHT DEFENSE, FAILED TO TAILOR THE THEFT INSTRUCTION, AND FAILED TO PROPERLY RESPOND TO A JURY QUESTION ABOUT THE ABSENCE OF EVIDENCE (Not Raised Below).

A. It Was Plain Error To Omit A Claim Of Right Charge Where The Evidence Established The Defense And The State Improperly Suggested That Defendant's Mental State Was Irrelevant To The Jury's Determination Of Whether He Committed Theft.

B. The Court's Failure To Tailor The Theft Instruction And To Properly Respond To A Jury Question About The Absence Of Evidence Mandate Reversal.

POINT V

THE PROSECUTOR'S IMPROPER BURDEN SHIFTING AND COMMENTS ON FACTS NOT IN EVIDENCE REQUIRE REVERSAL (Not Raised Below).

A. The Prosecutor Improperly Shifted The Burden Of Proof To The Defense On The Factual Question Of Whether Defendant Violated The Sick Leave Policy By Faking Being Sick.

16

B.  The Prosecutor Relied On Facts Not In Evidence When Attempting To Explain Why Defendant Was Criminally Prosecuted For Violating Internal Police Department Policies And Offered His Personal Belief In Defendant's Guilt.

POINT VI

THE IMPROPER ADMISSION OF OTHER-BAD ACTS EVIDENCE REQUIRES REVERSAL (Not Raised Below).

POINT VII

THE CUMULATIVE EFFECT OF THE ERRORS DEPRIVED DEFENDANT OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL SUCH THAT HIS TRIAL CONVICTIONS SHOULD BE REVERSED AND HE SHOULD BE GIVEN THE OPPORTUNITY TO WITHDRAW FROM HIS SUBSEQUENT GUILTY PLEA (Not Raised Below).

POINT VIII

THE OFFICIAL MISCONDUCT CONVICTIONS SHOULD MERGE, RESPECTIVELY, WITH THE THEFT AND CONSPIRACY CONVICTIONS (Not Raised Below).

POINT IX

RESENTENCING IS REQUIRED BECAUSE THE SENTENCING PROCEEDING WAS REPLETE WITH ERRORS.

A.　The Sentencing Court Failed To Explain Why It Did Not Find Applicable Mitigating Factors 8 And 9.

B.　The Sentencing Court Did Not Provide A Factual Basis For Its Application Of Aggravating Factor 9.

C.　The Sentencing Court Did Not Assign Weight To Any Of The Factors It Found.

D.　The Sentencing Court Failed To Consider The Application Of The Aggravating Factors To Each Individual Offense.

Additionally, defendant presented this supplemental argument in his uncounseled self-represented brief:

SUPPLEMENTAL POINT I

THE TRIAL COURT SHOULD HAVE GRANTED A JUDGMENT OF ACQUITTAL AS FOR THE CONVICTIONS FOR OFFICIAL MISCONDUCT AND/OR THEFT BECAUSE THE STATE FAILED TO PRODUCE SUFFICIENT EVIDENCE AND MEET ITS BURDEN IN PROVING ALL ELEMENTS OF THE OFFENSE AS REQUIRED BY LAW.

After hearing the initial oral argument on appeal, we invited the Attorney General and the Association of Criminal Defense Lawyers of New Jersey to

18

participate as amici curiae, limited to the issues relating to the official misconduct conviction. They accepted our invitation and took part in additional helpful briefing and re-argument.

II.

We primarily focus in this opinion on the legal viability of defendant's conviction of official misconduct under N.J.S.A. 2C:30-2(a).

N.J.S.A. 2C:30-2 provides:

> A public servant is guilty of official misconduct when, with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit:
>
> a. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized or he is committing such act in an unauthorized manner; or
>
> b. He knowingly refrains from performing a duty which is imposed upon him by law or is clearly inherent in the nature of his office.
>
> [(Emphasis added).]

Here, defendant was charged in count two under N.J.S.A. 2C:30-2(a), which concerns the commission of a qualifying unauthorized act. He was not

19

charged under subsection (b) of the statute, which concerns inaction, i.e., knowingly refraining from performing a duty.[3]

Violation of the statute exposes a defendant to a stiff criminal penalty. Official misconduct is graded as a second-degree offense, although if the benefit involved is pecuniary and valued at $200 or less (not applicable here), the offense is a third-degree offense. See N.J.S.A. 2C:30-2 (unnumbered final paragraph); see also State v. Phelps, 187 N.J. Super. 364, 374-76 (App. Div. 1983), aff'd, 96 N.J. 500 (1984).

Pursuant to N.J.S.A. 2C:43-6.5, a defendant convicted of second-degree official misconduct must be sentenced to a mandatory minimum term of at least five years' imprisonment without eligibility for parole. In addition, under the general terms of N.J.S.A. 2C:43-6(a)(2), a sentence for a second-degree crime must be between five and ten years.

---

[3] Because subsection (b) was not charged, we need not ponder whether defendant had a duty to advise the NPD to not send him (or to stop sending him) sick pay benefits while he was working at the hospital, or a duty to not deposit those sums, or a duty to refund the money, or a duty to advise the NPD that he was healthy enough to work at the hospital, or failed to perform some other conceivable and unperformed duty.

A-0117-23

## A.
### (New Jersey Statutory and Legislative History)

The origins of New Jersey's official misconduct statute extend back as far as 1898, when the Legislature established "neglect of duty" as a misdemeanor. That 1898 statute provided that "[a]ny magistrate or other public officer who shall willfully refuse or neglect to perform . . . any duty imposed upon him by law" committed the offense. L. 1898, c. 235, § 23. Official misconduct was also considered a common law offense in New Jersey. See State v. Lombardo, 18 N.J. Super. 511, 522 (Law Div. 1952) (observing that "[m]alfeasance in office, generally termed official misconduct, is a common law offense"). Later revisions of the state criminal code retained the same essential text from the 1898 statute until the adoption of the modern New Jersey Criminal Code in 1978. See, e.g., N.J. Rev. Stat. § 2:160-1 (1937).

The concept of official misconduct was redefined in the 1978 Criminal Code. An associated Senate Judiciary Committee statement declared that Chapter 30 of the revised code codified those official misconduct offenses "which, while not found in current New Jersey statutes, were indictable at common law." Senate Judiciary Statement to S. 738, at 7 (May 15, 1978). An amendment in 1979 deleted a reference to "corrupt" intent, which had been an undefined term. Senate Judiciary Statement to S. 3203, at 7 (June 18, 1979).

21

The text of our statute in Title 2C has remained unchanged since it became effective in 1979.

## B.
### (Parallels with New York Law)

When the 1978 Criminal Code was enacted, the drafters looked substantially to the official misconduct laws of the State of New York. See State v. Hinds, 143 N.J. 540, 548 (1996) ("[O]ur [official misconduct] law is based on New York law").[4] The history of New York's official misconduct statute is therefore comparatively instructive.

New York Penal Law of 1881 had provided that a public officer "upon whom any duty is enjoined by law, who willfully neglects to perform the duty, is guilty of a misdemeanor." N.Y. Penal Law former § 117 (1881); see also id. § 154 (criminalizing the omission of official duties).

In 1965, New York undertook a large-scale revision and modernization of its Penal Law. As part of that process, the New York State Commission on Revision of the Penal Law and Criminal Code, known as the "Bartlett

---

[4] Although many other portions of the new Code were derived from the Model Penal Code or our state's previous criminal laws, the new section for the official misconduct statute—N.J.S.A. 2C:30-2—simply cited its source as "New." Official Copy Reprint of S. 738 117 (Aug. 10, 1978). It did not mention New York law.

Commission," was convened to study and simplify the New York laws. The Bartlett Commission recommended that New York replace "some thirty existing Penal Law provisions . . . involving violations of specific duties by specified public officers." Proposed New York Penal Law § 200.00 [now § 195.00] at 370 (1964) ("Bartlett Committee Notes"); see also William C. Donnino, Prac. Comments., McKinney's Cons. L. of N.Y., Penal Law § 195.00 (2025).

New York in 1965 adopted a revised official misconduct statute whose elements are substantially the same as the later New Jersey counterpart in N.J.S.A. 2C:30-2. One noteworthy difference is that our own statute additionally prohibits officials in subsection (a) from committing acts relating to their office "in an unauthorized manner." Compare N.Y. Penal Law § 195.00(a) with N.J.S.A. 2C:30-2(a).

Specifically, N.Y. Penal Law § 195.00(a), the analog to N.J.S.A. 2C:30-2(a), provides in pertinent part:

> A public servant is guilty of official misconduct when, with intent to obtain a benefit or deprive another person of a benefit: [] He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized[.]
>
> [(Emphasis added).]

As counsel noted, the 1965 revision to the New York Penal Law is the first appearance of the phrase "unauthorized exercise of his official functions" in the statutory history of the official misconduct offense in either state's law. N.Y. Penal Law § 195.00(a) (2025). As we will see, infra, that concept, replicated in N.J.S.A. 2C:30-2(a), becomes a critical aspect of our analysis in this case.

## C.
### (Elements of Subsection (a))

With this background in mind, we turn to the elements of the statute and, in particular, subsection (a).

To begin with, the prefatory text of N.J.S.A. 2C:30-2, which covers both subsections (a) and (b), requires that the defendant be "a public servant." That requirement is readily satisfied here because defendant was a municipal police officer.

The prefatory text further requires the public servant to act "with purpose to obtain a benefit for himself or another or to injure or to deprive another of a benefit." N.J.S.A. 2C:30-2. That requirement was also proven here, as the State showed that defendant purposely obtained a "benefit for himself" through his receipt of sick pay from the NPD while simultaneously working as a private security guard. See State v. Cetnar, 341 N.J. Super. 257, 264 (App. Div. 2001),

<u>certif. denied</u>,170 N.J. 89 (2001) (treating a county prosecutor's office detective who improperly used departmental funds disbursed for an undercover narcotics investigation to pay his personal expenses as the purposeful recipient of a "benefit" under the statute).

Following the statutory preface, subsection (a) then delineates several elements of official misconduct involving active conduct rather than failure to perform a duty. For ease of reference, the elements can be displayed with bullet points as follows:

- "[Defendant] commits an act relating to his office but constituting an unauthorized exercise of his official functions;"

- "[K]nowing that such act is unauthorized or he is committing such act in an unauthorized manner."

Much of the briefing before us addresses the second bullet point, concerning whether the State sufficiently proved that defendant's conduct was "unauthorized," and that he "knowingly" engaged in that unauthorized conduct. The State contends defendant's receipt of sick pay from the NPD while he was working as a private security guard was "unauthorized" because, as the documentary exhibits and testimony from its witnesses showed, the policy of the NPD disallowed officers from obtaining sick pay while employed in another

25

job. The State further asserts, as the jury evidently found despite defendant's denials, that he knew his employer's policy prohibited such "double dipping."

Defendant counters that the State's evidence failed to prove such an "unauthorized" act, arguing that the statute should not be construed to criminalize conduct that merely violates workplace administrative policies. Defendant further contends that the State did not prove beyond a reasonable doubt that he "knowingly" violated the policy, as it did not present any signed acknowledgment form or other documentary evidence that he was properly informed of the policy.

We need not resolve here those issues of what is "unauthorized" conduct[5] or concerning the extent of defendant's knowledge because the analysis instead can turn on another critical element of subsection (a): specifically, whether the defendant committed "an act relating to his office but constituting an unauthorized exercise of his official functions." (Emphasis added).

---

[5] We therefore do not need to resolve the conceptual question of whether the term "unauthorized," which is not defined in the statute, encompasses only conduct that is explicitly prohibited, or whether it also extends to conduct that is not explicitly permitted by the public employer's policies. We also need not resolve whether subsection (a) criminalizes allegedly minor or de minimis violations of workplace policies, such as a one-time unauthorized use of a squad car during lunch hour to pick up an officer's dry cleaning, or (as hypothesized by the public defender), the unauthorized removal of pads and pens for personal use.

A-0117-23

When considering this element, our courts "look to the scope of the defendant's apparent authority" to determine whether the alleged misconduct "sufficiently relates to the defendant's office." State v. Thompson, 402 N.J. Super. 177, 192 (App. Div. 2001). "[N]ot every offense committed by a public official involves official misconduct." Hinds, 143 N.J. at 549. It is insufficient to show that an act of misconduct was "committed by a person who happens to be a public officer." State v. Schenkolewski, 301 N.J. Super. 115, 144 (App. Div. 1997). Instead, the State must show that the misconduct is connected to the defendant's "official duties." Ibid. There must be "a relationship" between the conduct and the defendant's office, and the defendant "must rely upon his or her status as a public official to gain a benefit or deprive another." State v. Kueny, 411 N.J. Super. 392, 405 (App. Div. 2010).

The case law in our state involving law enforcement officers or employees convicted of official misconduct under subsection (a) typically has involved situations in which the "unauthorized exercise of official functions" entails a misuse of the defendant's authority as a law enforcement official. The misuse may involve either off-duty or on-duty conduct, and it can be committed while the officer is on leave or suspended. State v. Bullock, 136 N.J. 149, 157 (1994).

A-0117-23

For instance, our courts have upheld convictions of law enforcement officers under N.J.S.A. 2C:30-2 in the following scenarios: (1) an off-duty detective's use of his office to avoid suspicion from store management while working with a shop's security manager to shoplift, Hinds, 143 N.J. at 540; (2) a suspended police officer displaying his identification card to fraudulently "arrest" two individuals, Bullock, 136 N.J. at 151; (3) an off-duty police officer donning his uniform to fake a drug arrest, State v. Johnson, 127 N.J. 458, 462-63 (1992); (4) a police officer's "use of public resources during business hours" to make phone calls and send e-mails to an undercover detective posing as a fourteen-year-old-girl, State v. Davis, 390 N.J. Super. 573, 589 (App. Div. 2007); (5) a police officer using a police car and public telephone for personal business, State v. Gleitsmann, 62 N.J. Super. 15, 19-20 (App. Div. 1960); and (6) a police officer who unconstitutionally strip searched a person, State v. Stevens, 203 N.J. Super. 59, 67-68 (Law Div. 1984). See also Cetnar, 341 N.J. Super. at 259-60 (involving a detective's official functions in improperly securing funds for a supposed undercover narcotics investigation).

By contrast, in State v. Kueny, 411 N.J. Super. at 408, we found that the defendant police officer "did not use his status as a police officer" when accidentally withdrawing and then improperly keeping money from someone

28

else's bank account at an ATM.  See also State v. DeCree, 343 N.J. Super. 410, 418 (App. Div. 2001) (holding that a defendant's actions in joining a scheme to defraud the State Health Benefits Program "had nothing to do with her status as a security guard").

New York case law has adopted similar approaches to the "official functions" requirement.  For example, in People v. Arcila, 59 N.Y.S. 3d 141, 142-43 (App. Div. 2017), the court held that the New York official misconduct statute applied to a police officer who sexually assaulted a woman and stated that he could give her a ticket.  Similarly, in People v. Watson, 821 N.Y.S. 2d 328, 331 (App. Div. 2006), the New York statute covered a police officer who targeted and sexually harassed a fellow officer during a traffic stop.  By contrast, in People v. Rossi, 415 N.Y.S. 2d 21, 22 (App. Div. 1979), aff'd, 407 N.E. 2d 1345 (N.Y. 1980), the appellate court held the statute did not apply where the defendant took money to assist with traffic tickets, which had no relation to his functions as a corrections officer.  Likewise, in People v. Groskin, 505 N.Y.S. 2d 475, 476 (App. Div. 1986), the appellate court held that the New York statute did not extend to an employee of the Department of Corrections who postured as though he had discretion over conjugal visits in order to solicit sexual favors.

29

## D.
### (Application to This Case)

Applying these principles to the circumstances here, we conclude as a matter of law that defendant's conduct, although it was a crime of theft,[6] did not "constitute" the "unauthorized exercise of his <u>official functions</u>." (Emphasis added). His behavior in accepting the sick pay benefits did not entail any of the customary functions of a police officer or detective, such as responding to police dispatches, investigating possible criminal activity, tracking down and interviewing witnesses, arresting or interrogating suspects, seizing physical evidence, procuring search warrants, preparing and compiling police reports, and the like. He did not interact with the public acting, or pretending to act as, a law enforcement official. He was not functioning as a police officer. Nor was he portraying himself to others as acting in an official police capacity, as was the case in some of the cited opinions.

As we noted above, while working as a private security guard, defendant wore a uniform with a badge that clearly indicated he was an employee of St. Michael's hospital, not the NPD. In addition, his duties on the premises were limited and NPD officers would be summoned to the scene in various situations.

---

[6] <u>See</u> our discussion of the theft issues in Part III(B), <u>infra</u>.

In short, he was not engaged in what "constitutes" the "official" functions of a municipal police officer.

In construing the statute in this manner, we are guided in part by the rule of lenity, which generally requires that criminal statutes be strictly construed such that "words are given their ordinary meaning and that any reasonable doubt . . . is decided in favor of [the defendant]." State v. Olivero, 221 N.J. 632, 639 (2015) (alteration in original). The circumstances here do not clearly transgress subsection (a)'s requirement that the defendant engage in the "unauthorized exercise of his official functions." By working as a private security guard while on sick leave status, defendant was not manifestly engaged in "official functions." There is no evidence he was holding himself out to people at the hospital as a city police officer.

Simply put, subsection (a)[7] does not encompass these particular facts. Based on these legal reasons, we are constrained to vacate defendant's conviction of official misconduct under count two of the indictment. In doing so, we should not be understood as condoning in any way defendant's dishonest behavior and his improper receipt of taxpayer-funded sick pay that he did not

---

[7] Again, we offer no advisory opinion about the potential applicability of the failure-to-act elements of subsection (b).

A-0117-23

deserve. That wrongdoing was properly found by the jury to be the commission of theft, which we will discuss in more detail, infra. Nor do we rescind or foreclose the imposition of civil or administrative sanctions as disciplinary measures. The conviction of count two is accordingly vacated.

### III.

We address defendant's remaining arguments in brief succession.

### A.
(Adjournment Request to Retain New Counsel)

Defendant contends he was deprived of trial counsel of his choice because the pretrial judge denied his request for an ample adjournment to obtain new private counsel before the case was tried. He argues he is entitled to have his convictions vacated and receive a new trial on that basis.

The chronology pertinent to this issue is as follows: It arose at a status conference hearing held virtually on August 24, 2020. At that time, which was in the initial months of the COVID-19 pandemic, the case was not yet on the trial list, in part because Essex County had stopped holding in-person trials due to the pandemic.

During the conference, the private attorney who had then been representing defendant asked to be relieved based on an asserted irreconcilable breakdown in the attorney-client relationship. Although the prosecutor agreed

the pandemic was main reason why the case had been delayed, the prosecution argued that counsel's request was a tactic to further delay the trial.

The pretrial judge observed that at that point, the three indictments against defendant were "over a year old." Nonetheless, the judge agreed that if communication between defendant and his counsel had "broken down to a point of irreparable harm" as counsel had stated, it would be "inappropriate" for him to proceed as counsel.

After granting the motion to be relieved, the pretrial judge directed her team leader to interview defendant about the appointment of a public defender. The judge further instructed withdrawing counsel to transfer all discovery to the new attorney. Defendant interrupted the judge's discussion with counsel and her staff, announcing, "I'm going to be hiring a private attorney." The judge replied, "Sir, if you don't have a private attorney assigned in the next seven days whoever is appointed is your attorney. I cannot have this case wait any longer, it's been over a year. There [are] no more delays." The judge added, "[b]ut if it is not by . . . the 31st of August, whoever is appointed by the Public Defender's Office, that is your attorney."

Defendant responded that the substitute lawyer he planned to hire was out of his office for vacation, and he asked the court for more than seven days to

A-0117-23

secure that lawyer's services. Without further inquiry or discussion, the judge reiterated that successor private counsel would need to file papers entering an appearance "by next Monday, or else whoever is appointed is the person the [c]ourt will recognize as your attorney."

Defendant did not secure a new private attorney before the court's deadline. Accordingly, he was provided with representation by a private attorney who was assigned by the Public Defender's Office.[8]

The case was not tried until March 2023, more than two years and six months after the court ruled in August 2020 on defendant's request to retain a new private attorney. We have inquired of appellate counsel for both parties as to the cause of this delay, and they are unaware of why the case took so long to be called for trial, although they believe the long delay was associated with the COVID-19 pandemic.

Defendant argues that his constitutional right to counsel of choice was violated when the trial court in August 2020 gave him only seven days to hire new counsel. He asserts the court failed to address the factors prescribed in

---

[8] Although the trial transcripts identify defense counsel as an attorney with a law firm, the State does not contest that he was assigned by the Public Defender. The transcripts reflect he was the third lawyer who successively represented defendant in this case.

State v. Furguson, 198 N.J. Super. 395, 402 (App. Div. 1985), before denying his request for more time. Those factors include: (1) "the length of the requested delay"; (2) "whether other continuances have been requested and granted"; (3) "the balanced convenience or inconvenience to the litigants, witnesses, counsel, and the court"; (4) "whether the requested delay is for legitimate reasons, or whether it is dilatory, purposeful, or contrived"; (5) "whether the defendant has other competent counsel prepared to try the case"; (6) "whether denying the continuance will result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature"; (7) "the complexity of the case"; and (8) "any other relevant factors which may appear in the context of any particular case." Ibid. (quoting United States v. Burton, 584 F.2d 485, 490-91 (D.C. Cir. 1978)).

Defendant maintains the trial court's lack of analysis of the Furguson factors is a "structural error" that requires the outcome of his 2023 trial to be set aside. See State v. Kates, 216 N.J. 393, 396-97 (2014) (recognizing that a denial of a trial adjournment to enable a defendant to obtain new retained counsel may qualify as structural error). Nevertheless, we agree with the State that, in these particular circumstances, that remedy of nullification is unwarranted.

A-0117-23

We are cognizant of the constitutional importance of affording criminal defendants who can afford a private attorney a fair opportunity to retain counsel of their choice. See United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006); State v. Fusco, 93 N.J. 578, 583 (1983). Even so, as defendant acknowledges in his brief, "the right to counsel is not limitless," and may be balanced against other considerations.

As we noted in Furguson, "the right to retain counsel of one's own choice is not absolute, and 'cannot be insisted upon in a manner that will obstruct an orderly procedure in courts of justice and deprive such courts of the exercise of their inherent powers to control the same.'" Furguson, 198 N.J. Super. at 401 (quoting Smith v. United States, 288 Fed. 259, 261 (D.C. Cir. 1923)) (internal citations omitted). In that regard, a defendant must "act expeditiously in obtaining counsel of his own choice." Ibid.

We elaborated on these principles in State v. McLaughlin, 310 N.J. Super. 242, 258-59 (App. Div. 1998). We underscored a defendant's responsibility to "act with reasonable diligence in securing counsel." Id. at 259. Moreover, we declined in McLaughlin to treat the denial of a trial adjournment to retain new counsel as a basis for automatic reversal. Instead, we instructed that "a trial court's decision to deny a request for an adjournment to permit a defendant to

retain counsel of his choice will not be deemed reversible error absent a showing of an abuse of discretion which caused defendant a 'manifest wrong or injury.'" Id. at 259 (quoting Furguson, 198 N.J. Super. at 402).

Here, we agree the trial court erred in denying defendant's request for more than seven days to retain successor counsel, without conducting a proper analysis of the Furguson factors. We need not address, in the first instance on appeal, those factors one-by-one ourselves.

Although we appreciate the possibility that defendant may well have been hoping to use the adjournment, as the State claimed, as a stalling tactic, there was no trial date looming. Indeed, with the pandemic-related shutdown of the trial calendar then extant, the one-week deadline the court imposed seems, in retrospect, unnecessarily short. We therefore conclude the court erred by misapplying its discretion. Nothing more needs to be said on that point.

The remedy of reversal and a new trial, however, is unwarranted in the particular circumstances before us. As we noted, nearly three years elapsed between the court's 2020 ruling and the eventual trial in 2023. The record reflects no motion nor any attempt by defendant during that long interval to ask the trial court to reconsider a substitution of new private counsel, who would be his fourth lawyer in the case. Defendant had plenty of time during the pandemic

to arrange a new attorney and return to court with a renewed request. There is no reason to believe such a request would have been disruptive, while trials in the vicinage were fully halted and ultimately were slowly resumed. None of the cases cited by defendant involved a comparable extended delay.

In short, defendant has not demonstrated a "manifest wrong or injury" that requires the jury's verdict to be set aside on this basis and the case to be tried again.

## B.
### (The Theft Conviction)

Defendant argues that his conviction of theft should be set aside for three reasons that were not raised below. In his counseled brief, he asserts the court (1) wrongfully failed to give the jury, sua sponte, an instruction on a claim-of-right defense, (2) did not tailor its instructions on theft to the facts of the case, and (3) did not respond adequately to a jury question about the theft count during deliberations. Because none of these arguments were presented to the trial court, defendant must establish they comprise plain error. State v. Alexander, 233 N.J. 132, 141-42 (2018). In addition, in his supplemental uncounseled brief, defendant argues he was entitled to a judgment of acquittal on the theft count because the State's evidence was allegedly insufficient to prove that crime.

We first dispense with defendant's claim for a judgment of acquittal on theft. The relevant elements of the theft statute are set forth in the Criminal Code at N.J.S.A. 2C:20-3(a). They were amply proven by the State here beyond a reasonable doubt.

Under N.J.S.A. 2C:20-3(a), a person commits theft "if he unlawfully takes, or exercises unlawful control over, movable property of another with purpose to deprive him thereof." The State presented evidence, in the form of leave and pay records, that defendant worked at St. Michael's on thirty-one occasions while collecting sick leave pay from the NPD. It also presented the NPD's sick leave and outside employment policies, which prohibited this conduct. This evidence demonstrated that defendant took property—i.e., money—from the NPD, with no intention of returning it, and that this conduct was unlawful.

Giving the State the benefit of all its favorable evidence and all reasonable inferences therefrom, State v. D.A., 191 N.J. 158, 163 (2007), the evidence therefore sufficed to establish defendant's guilt of theft. We thus reject defendant's self-represented argument that he was entitled to a judgment of acquittal on the theft count.

A-0117-23

We turn next to the court's jury instruction. The trial court duly charged the jury on the offense of theft by unlawful taking, explaining that "a person is guilty of theft if he unlawfully takes or exercises unlawful control over moveable property of another with the purpose to deprive him thereof." It then explained each of the elements of the offense in turn.

In pertinent part, the court explained the first element the State needed to prove was that defendant "knowingly took or exercised unlawful control over moveable property." The court defined moveable property and explained the "knowing" state of mind and how it may be proven. The court then explained that the second element was that "the moveable property [was] property of another," defining this to mean "property in which any person other than the defendant has an interest which the defendant is not privileged to infringe." The court lastly advised the jury that the third element was that "defendant's purpose was to deprive the other person of the moveable property," defined "deprive," and explained the concept of "purpose."

In this manner, the court's instruction tracked the model instruction. Model Jury Charges (Criminal), "Theft of Moveable Property (N.J.S.A. 2C:20-3a)" (rev. Feb. 11, 2008). Adherence to the model charges is generally

A-0117-23

indicative, although not necessarily dispositive, that the jury was properly instructed. State v. R.B., 183 N.J. 308, 325 (2005).

Defendant argues the court, sua sponte, should have given the jury an additional instruction on his claim-of-right defense, because he asserts there was evidence indicating he did not know that he was violating the policies or that he would not be entitled to his NPD paycheck if he continued working at St. Michael's while on leave. We discern no plain error from the absence of that unrequested charge.

Pursuant to N.J.S.A. 2C:20-2(c), it is an affirmative defense to a charge of theft that the defendant "[a]cted under an honest claim of right to the property or service involved or that he had a right to acquire or dispose of it as he did." This concept is essentially, if not explicitly, conveyed in the jury charge detailing the elements of theft itself, by requiring the State to prove that defendant "knowingly" and "unlawfully" took property that did not belong to him. Although it was apparently not believed by the jury, defendant testified, in essence, that it was "unclear" that he was not allowed to collect sick pay from the Police Department while at the same time working for the hospital. He also claimed that a policy disallowing the receipt of sick pay in such circumstances was allegedly "never enforced." But such assertions of ignorance and non-

41

enforcement are not synonymous with establishing an affirmative claim of "right." Defendant did not point to any written policies or other documents issued by the NPD that state officers had a right to call in sick and simultaneously get paid by a private employer for work as a security guard.

Although we need not decide here if the court would have erred by rejecting a request for a claim-of-right charge, we note that no such request was made. Instead, defendant approved the jury instructions that were given. The proposed additional charge was not so apparent to be regarded on appeal as one "clearly indicated" to have been provided. State v. Rivera, 205 N.J. 472, 490 (2011) (citing State v. Choice, 98 N.J. 295, 299 (1985)).

We likewise reject defendant's related argument that the theft charge should have been "tailored" more to the facts of this case. The charge as a whole sufficiently explained the elements of the offenses and the State's theory of how defendant committed theft: by unlawfully taking sick pay over seven months while he was working another security job that he was apparently fit enough to perform. The charge as a whole was adequate—as is—and did not require further tailoring or elaboration. See State v. Torres, 183 N.J. 554, 564 (2005) (noting the importance of appellate consideration of the charge "as a whole").

42

Lastly, we reject defendant's argument that the court's response to a jury question asking the court to specify the evidence supporting the theft offense was insufficient, because the court only told the jury that it needed to continue deliberating. He asserts the court should have told the jurors "that their recollection of the evidence controlled and that they could ask for the playback of any testimony if they wanted it." Once again, we discern no plain error. The court specifically asked counsel if they had any objection to the court repeating to the jurors the basic instruction about when to continue deliberations, and they had no objection to that plan. The court was not obligated to say more. The alleged error, if any, was not "clearly capable of producing an unjust result." R. 2:10-2; accord State v. Barden, 195 N.J. 375, 394 (2008).

C.
(Evidentiary Objections)

The two evidentiary objections defendant raises for the first time on appeal likewise are unavailing and do not establish any plain error.

First, we reject defendant's belated hearsay objection to the leave and sick pay records from the NPD and the work schedule and payroll documents from St. Michael's. Both of those groups of exhibits are manifestly in the nature of business records admissible under the hearsay exception codified in N.J.R.E. 803(c)(6). Although the foundation for applying the business record exception

43

conceivably could have been more fulsome, defendant never objected to the foundation nor the admission of the documents. Had he done so, the State would have had a chance to elaborate upon the foundation. Instead, defense counsel chose to try to impeach the probative value and accuracy of the documents.

We are similarly unpersuaded by defendant's argument that the court committed plain error under N.J.R.E. 404(b) by allowing the State to elicit brief testimony from Neves about his awareness of a "criminal complaint or criminal allegation" against defendant in February 2018. For one thing, it is not clear that the allusion is to a criminal allegation distinct from the present matter. Even if it is, the vague reference, which was not punctuated in the State's closing argument, has not been shown to be clearly capable of producing an unjust result.

## D.
### (The Prosecutor's Closing Argument)

We reject defendant's argument, also raised for the first time on appeal, that the prosecutor's closing argument was so prejudicial that it deprived him of a fair trial. Among other things, defendant complains about the prosecutor's assertions concerning the legitimacy and severity of defendant's claimed back injury, his comments justifying the State's decision to charge defendant criminally, and the flagrancy of defendant's violation of the sick pay policies.

A-0117-23

Having evaluated these and other comments noted in defendant's appellate brief, we do not conclude they rise to the level of a deprivation of defendant's right to a fair trial. Indeed, many of these arguments were responding to points made in defense counsel's forceful summation. State v. McGuire, 419 N.J. Super. 88, 145-48 (App. Div. 2011). Here again, we discern no plain error, in the absence of objection.

E.
(Sentencing and Plea Withdrawal Issues)

Defendant argues his sentence was excessive in several respects, failed to merge the counts as necessary, and must be remanded for reconsideration. He also argues that he should be permitted to withdraw his guilty pleas on the other indictments because of the alleged flaws in the present case.

We do not resolve those issues here because our decision to vacate the official misconduct conviction can affect those matters. We accordingly remand the sentencing and plea-withdrawal matters for consideration by the trial court in light of disposition of the appeal. In the meantime, defendant's present sentence shall remain in effect and his guilty pleas on the other charges shall remain undisturbed.

To the extent we have not mentioned them, all other points raised by defendant lack sufficient merit to warrant discussion. R. 2:11-3(e)(2).

A-0117-23

Affirmed in part, reversed in part, and remanded.  We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-0117-23